UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| QUINTELLA STATEN, on behalf of K.C., a minor, ) | |
| ) | |
| Plaintiff, ) | 14 C 3055 |
| ) | |
| vs. ) | Judge Feinerman |
| ) | |
| CAROLYN W. COLVIN, Acting Commissioner of ) | |
| Social Security, ) | |
| ) | |
| Defendant. ) | |

**MEMORANDUM OPINION AND ORDER**

On November 15, 2010, Quintella Staten filed a claim for supplemental security income benefits with the Social Security Administration on behalf of her son, K.C., a minor. Doc. 11-6 at 2-7. The Commissioner denied the claim on May 31, 2011, Doc. 11-5 at 2-5, and then denied Staten's request for reconsideration on October 13, 2011, *id*. at 6-10. Staten sought and received a hearing on July 18, 2012 before an administrative law judge ("ALJ") pursuant to 20 C.F.R. § 404.914. Doc. 11-3 at 37-82. The ALJ denied the claim on November 9, 2012, *id*. at 11-31, and the Social Security Appeals Council denied Staten's request for review of the ALJ's decision on February 28, 2014, *id*. at 2-4, making the ALJ's decision the final decision of the Commissioner. *See Scrogham v. Colvin*, 765 F.3d 685, 695 (7th Cir. 2014). Staten timely sought judicial review of the final decision pursuant to 42 U.S.C. § 405(g). Doc. 1.

Before the court is Staten's motion for summary judgment or remand and the Commissioner's request to affirm her decision. Docs. 12, 22. For the following reasons, Staten's motion is denied and the Commissioner's decision is affirmed.

1

## Background

The Social Security Administration has established a three-step sequential evaluation process for determining whether a claimant under the age of 18 is disabled. *See* 20 C.F.R. § 416.924(a). The three steps are as follows:

> First, if the child is engaged in substantial gainful activity, the [decisionmaker] will deny the claim. Second, if the child does not have a severe medical impairment or combination of impairments, then she is not disabled. Third, the child's impairments must meet, medically equal, or functionally equal any of the listings contained in 20 C.F.R. Pt. 404, Subpt. P, App. 1.

*Jelinek v. Astrue*, 662 F.3d 805, 809-10 (7th Cir. 2011); *see also Hopgood ex rel. L.G. v. Astrue*, 578 F.3d 696, 699 (7th Cir. 2009). A child's impairments "functionally equal the listings contained in 20 C.F.R. Pt. 404, Subpt. P, App. 1"—hereinafter called "the listings"—if they result in a "marked limitation" in at least two, or an extreme limitation in at least one, of the following domains: "(1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for oneself; and (6) health and physical well-being." *Jelinek*, 602 F.3d at 810 n.2; *see* 20 C.F.R. § 416.926a(a), (b)(1). The regulations state that a "marked limitation" is one that "interferes seriously with [the] ability to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(2), (g)-(*l*). The agency "retains substantial discretion" to determine a limitation's severity in any given case. *Keys v. Barnhart*, 347 F.3d 990, 994 (7th Cir. 2003).

### A. Factual Background

K.C. was born on July 29, 2004, and began treatment for attention deficit hyperactivity disorder in 2010. Doc. 11-8 at 40. (He saw a neurologist for seizures, but by 2009 that condition had resolved. Doc. 11-11 at 110.) According to his medical records, K.C. began taking 10 mg of Ritalin LA in November 2010 to address problems with inattention. Doc. 11-8 at 40. By

2

February 2011, K.C.'s prescription had changed to Focalin XR, and his doctor reported that K.C. was "doing much better with attention and school work." Doc. 11-8 at 52. Later that year, Staten told the doctor that she had not received any complaints from K.C.'s school since he went on the medication, but she also reported that the medication's effect seemed to wear off around 4:00 p.m. Doc. 11-12 at 24. The doctor responded by adjusting K.C.'s dosage to 10 mg of Focalin XR in the morning and 2.5 mg in the evening. *Id*. at 25. At a follow-up appointment in January 2012, Staten told the doctor that K.C. was having trouble sleeping; she also said that "[e]ven with his Focalin, he is still struggling with his homework, but he is able to complete it." *Id*. at 22. The doctor removed the evening dose and adjusted K.C's prescription to 15 mg of regular Focalin in the morning. *Id*. at 23.

Since 2010, K.C. has had an Individualized Education Plan ("IEP") at school. K.C.'s first IEP, issued in May 2010, when he was in kindergarten, provided for 755 minutes per week of direct special education services in a separate classroom. Doc. 11-8 at 24. An IQ test administered in connection with the IEP showed a verbal score of 77, a nonverbal score of 74, and a full scale score of 74. *Id*. at 31. However, the examiner noted that the scores were a "minimal estimate of possible cognitive potential" because K.C.'s "[t]esting behavior was self-directed and sometimes defiant." *Ibid*. K.C.'s next IEP, from 2011, indicated that he had made some progress during the previous year, but that he was still performing below grade-level academically and had difficulty staying on task and controlling his behavior. *Id*. at 94. The 2011 IEP slightly increased the amount of direct special education services time outside the classroom, *id*. at 107, and provided for additional shared paraprofessional support, *id*. at 97-98.

The most recent IEP in the record, from 2012, stated that K.C. was not functioning at the second grade level academically, noting that he "works at a much slower pace and needs

approximately 50% more time on task than his nondisabled peers." Doc. 11-12 at 71. The 2012 IEP also stated that K.C. "needs assistance to function daily in the General Education environment" because of his "difficulty staying on task, keeping up with the pace of the … classroom, focusing and following directions." *Id*. at 72. However, the 2012 IEP observed that K.C. "is able to function more appropriately in a classroom setting[] when medication is administered prior to coming to school …. Although[] he continues to require paraprofessional assistance and specialized services, he is calmer, more focused and has a desire to complete assignments." *Id*. at 73. "When medication has not been administered," by contrast, "[K.C.] cries, whines, complains, … has difficulty sitting, and completes no assignments." *Ibid*.

In May 2011, after Staten filed the benefits claim, K.C. was evaluated by a state agency medical consultant, Dr. Thomas Low. Dr. Low concluded that K.C.'s impairments were severe but did not meet, medically equal, or functionally equal the listings. Doc. 11-9 at 51-56. With respect to functional equivalence, Dr. Low opined that K.C. had a marked limitation in the acquiring and using information domain, but a less than marked limitation in the attending and completing tasks domain because he "is able to complete assignments and tasks with assistance." *Id*. at 53. Dr. Low further opined that K.C. had a less than marked limitation in the domain of health and physical well-being, and no limitations in the remaining three domains. *Id*. at 54-55. In September 2011, after the agency denied the claim and Staten sought reconsideration, two other state agency medical consultants, Dr. Cosme Cagas and Dr. David Voss, reevaluated K.C. They agreed with Dr. Low that K.C.'s impairments did not amount to a disability. *Id*. at 61-66. Drs. Cagas and Voss wrote that K.C. had less than marked limitations in three domains—acquiring and using information, interacting and relating with others, and health and physical well-being—and no limitations in the other three domains. *Id*. at 63-64.

Two of K.C.'s teachers completed questionnaires as part of the benefits application process. The questionnaires asked whether K.C. had "problems" functioning in five of the six functional equivalence domains. If the answer was "yes," the respondent was asked to rate the severity (from "no problem" to "very serious") and frequency (from "hourly" to "monthly") of the problem with respect to activities related to the domain. For example, activities under the attending and completing tasks domain included "focusing long enough to finish assigned activity or task," "changing from one activity to another without being disruptive," and "working without distracting self or others."

K.C.'s first grade special education teacher, Margaret Lopez, completed the questionnaire at the state agency's request. Ms. Lopez reported that K.C. had problems in four domains, including attending and completing tasks. Doc. 11-7 at 52-63. Regarding the attending and completing tasks domain, she rated K.C. as having "very serious" problems with three and "serious" problems with four of the domain's thirteen activities. *Id*. at 58. She also wrote that K.C. "required assistance in completing tasks, problem solving, and transitioning." *Ibid*.

K.C.'s second grade special education teacher, Ms. Barnes, also filled out a questionnaire, although she received it from K.C.'s attorney rather from than the state agency. *Id*. at 94-101. Ms. Barnes indicated that K.C. had problems in five domains, not four. She also consistently rated K.C. as having more frequent and serious problems than Ms. Lopez did. For example, Ms. Barnes rated K.C. as having "very serious problems" with eleven of the thirteen activities under the attending and completing tasks domain and a "serious problem" with one. *Id*. at 96. "When not medicated," Ms. Barnes wrote, K.C. "is in constant motion, non-stop talking (mumbling, singing), cries & refuses to attempt to work independently or with assistance." *Ibid*. She acknowledged, however, that K.C. was "more focused/attentive when

medicated." *Ibid*.; *see also id*. at 100 (noting that K.C. "is more cooperative" after taking medication).

B.     **The Administrative Hearing**

The administrative hearing was attended by the ALJ, Staten, K.C., K.C.'s attorney, and Dr. Allen Heinemann, an impartial medical expert. Doc. 11-3 at 39. After briefly speaking with K.C. about his routines at school and home, *id*. at 40-46, the ALJ questioned Staten. Staten told the ALJ that she had been filling K.C.'s Focalin prescriptions without any gaps since the end of 2010, and that while she believed that "there is a difference" when K.C. was medicated, the medicine seemed to wear off around 1:00 or 2:00 p.m. *Id.* at 52-53. Staten also described some of the accommodations K.C. received at school. *Id*. at 56-58. In response to questioning by K.C.'s attorney, Staten explained that K.C. needed assistance with his homework, that he had some disciplinary problems at school, and that he was unable to tie his own shoes. *Id*. at 60-63. The impartial medical expert, Dr. Heinemann, also questioned Staten. Staten told him that K.C.'s ability to pay attention had stayed the same throughout second grade and explained how, although K.C.'s medicine wore off in the afternoon, giving him additional Focalin in the afternoon seemed to interfere with his sleep. *Id*. at 69-71.

Dr. Heinemann then gave his opinion. Although he did not believe that the severity of K.C.'s impairments met or medically equaled a listing, he concluded that K.C. had marked limitations in two of the six functional equivalence domains—acquiring and using information, and attending and completing tasks. *Id*. at 76-78. Dr. Heinemann noted that Ms. Barnes had rated K.C.'s limitations in the attending and completing tasks domain as more serious than had Ms. Lopez. He felt that the two questionnaires showed "a very different perception, or at least a very different use of this rating scale by the two different teachers." *Id*. at 77-78. "My impression," he continued, "is that [Ms. Barnes' questionnaire] reflects [K.C.'s] behavior when

6

he's not on medication. … But he is on medication. He is benefitting. Mom is suffering trying to help him do the homework." *Id*. at 78. Dr. Heinemann concluded:

> Given that for the second half of the school year he was beneficially medicated at school, but that had worn off by the time he's doing homework, I guess I would rate him as marked in attending and completing tasks, because of the time limited benefit of the medication and good compliance with medication, and multiple attempts to get the right medication.

*Ibid*. Dr. Heinemann next stated that K.C. had less than marked or no limitations in the remaining four domains. *Ibid*. K.C.'s attorney asked Dr. Heinemann whether it was his testimony that K.C.'s impairments functionally equaled a listed impairment. He said it was, and K.C.'s attorney concluded the questioning. *Id*. at 78-79. The ALJ then confirmed with Dr. Heinemann that his opinion was "based on mom's testimony that the medication wears off." *Id*. at 79. The ALJ asked the attorney to submit copies of K.C.'s prescription records, and concluded the hearing. *Id*. at 80-82.

### C. The Commissioner's Decision

The ALJ issued her decision on November 9, 2012. Doc. 11-3 at 11-31. After setting forth the legal standard for disability, the ALJ made the following findings.

First, the ALJ determined that K.C. had not engaged in substantial gainful activity, that he had two severe impairments (attention deficit hyperactivity disorder and a learning disorder), and that the combination of those impairments did not meet or medically equal the listings. *Id*. at 17. As a result, the ALJ assessed whether K.C.'s impairments functionally equaled the listings, and concluded that they did not. *Id*. at 18.

The ALJ began the functional equivalence analysis by finding Staten's and K.C.'s testimony "mostly credible," except for Staten's testimony "concerning the claimant's compliance with his Focalin." *Id*. at 20. The ALJ reached that conclusion by examining K.C.'s prescription records from Walgreen's, which revealed that K.C. routinely went more than a

7

month between prescription refills, even though each refill contained only 30 days' worth of pills at the recommended dosage. *Id*. at 22-23. The ALJ also observed that K.C.'s medical records indicated that his medicine should be administered "every morning." *Ibid*. The ALJ noted that inconsistent compliance might explain Staten's statements that her son was hyperactive on weekends, as well as Ms. Barnes' questionnaire and K.C.'s 2012 IEP, which both implied that K.C. sometimes came to school unmedicated. *Id*. at 23.

The ALJ then assessed several other pieces of record evidence. She first observed that the evidence from the state agency consultants—first Dr. Low, and then Drs. Cagas and Voss— indicated that the severity of K.C.'s impairments did not functionally equal the listings. *Ibid*. While according "some weight" to those opinions, the ALJ stated that "information received at the hearing … shows that the claimant's limitations are different from those opined" by the consultants. *Ibid*. Next, the ALJ evaluated the teacher questionnaires. She gave more weight to Ms. Lopez than to Ms. Barnes for several reasons: Ms. Lopez received her questionnaire from the state agency rather than from K.C.'s attorney; Ms. Barnes' opinion seemed to be based, at least in part, on K.C.'s performance when he was not medicated; Ms. Lopez provided more narration than Ms. Barnes; and Ms. Barnes' opinion suggested that K.C.'s symptoms had gotten significantly worse since first grade, contrary to Staten's own testimony that K.C. was mostly stable. *Id*. at 24. Finally, the ALJ stated that she accorded significant weight to most of Dr. Heinemann's opinions, but not to his determination concerning K.C.'s limitations in the attending and completing tasks domain. That determination, the ALJ reasoned, was "predicated on the claimant's full compliance with medication"—a premise that the ALJ had already rejected. *Ibid*. Thus, the ALJ "reject[ed] Dr. Heinemann's opinion that the claimant suffers from a marked limitation in his ability to attend to and complete tasks." *Ibid*.

Turning to the six domains, the ALJ found that K.C. did have a marked limitation in acquiring and using information. *Id*. at 25. However, the ALJ found that K.C. had a less than marked limitation in the attending and completing tasks domain because his "difficulty in this domain appear[s] to be attenuated by medication." *Id*. at 26. In so finding, the ALJ noted that both Ms. Barnes and K.C.'s 2012 IEP indicated that K.C. performed better when medicated. Furthermore, Ms. Lopez's questionnaire showed that while K.C. had problems functioning in some aspects of the attending and completing tasks domain, he was better able to perform in others. And as just discussed, the ALJ discounted Dr. Heinemann's opinion about the attending and completing tasks domain because it was premised on the incorrect assumption that K.C. was fully compliant with his Focalin prescription. *Id*. at 26-27. The ALJ then found that that K.C. did not have marked limitations in any of the four remaining domains. *Id*. at 28-30. Staten does not challenge the ALJ's findings as to those four domains.

Because the ALJ found K.C. to have a marked limitation in only one domain and no extreme limitations, she concluded that he was not disabled for purposes of the Social Security Act. *Ibid*.

## Discussion

Section 405 of the Social Security Act authorizes judicial review of the Commissioner's final decision. *See* 42 U.S.C. § 405(g). The court reviews the Commissioner's legal determinations *de novo* and her factual findings deferentially, affirming those findings so long as they are supported by substantial evidence. *See Jones v. Astrue*, 623 F.3d 1155, 1160 (7th Cir. 2010); 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive"). Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion"; it

9

"must be more than a scintilla but may be less than a preponderance." *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007) (internal quotation marks omitted). If the reviewing court finds that the Commissioner's decision is not supported by substantial evidence, "a remand for further proceedings is [usually] the appropriate remedy." *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 355 (7th Cir. 2005). Moreover, the court "cannot uphold an administrative decision that fails to mention highly pertinent evidence," *Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010), or that contains errors of law, *Collins v. Astrue*, 324 F. App'x 516, 519 (7th Cir. 2009).

In addition to satisfying these standards, the Commissioner's opinion must build an "accurate and logical bridge from the evidence to [the] conclusion so that [the] reviewing court[] may assess the validity of the agency's ultimate findings and afford a claimant meaningful judicial review." *Young v. Barnhart*, 362 F.3d 995, 1002 (7th Cir. 2004) (internal quotation marks omitted); *see also Briscoe*, 425 F.3d at 351 ("In addition to relying on substantial evidence, the ALJ must also explain his analysis of the evidence with enough detail and clarity to permit meaningful appellate review."); *Zurawski v. Halter*, 245 F.3d 881, 888 (7th Cir. 2001) (holding that the ALJ must "articulate at some minimal level her analysis of the evidence to permit an informed review") (internal quotation marks and alterations omitted). To build a logical bridge, the Commissioner must "sufficiently articulate [her] assessment of the evidence to assure [the court] that [she] considered the important evidence and to enable [the court] to trace the path of [her] reasoning." *Hickman v. Apfel*, 187 F.3d 683, 689 (7th Cir. 1999) (internal quotation marks and alterations omitted). The court "cannot uphold a decision by an administrative agency … if, while there is enough evidence in the record to support the decision, the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996).

Staten argues that the ALJ—and hence the Commissioner—erred in three respects: (1) she substituted her own medical opinion for Dr. Heinemann's; (2) she applied an improper legal standard for disability; and (3) her conclusion was not supported by substantial evidence. None of these arguments have merit.

### A.     Medical Opinion

Staten first argues that the ALJ made an impermissible medical judgment by concluding, contrary to Dr. Heinemann's opinion, that K.C. had a less than marked limitation in the attending and completing tasks domain. Doc. 13 at 9-12. If K.C. had a marked limitation in that domain, he would have had a marked limitation in two domains—attending and completing tasks, and acquiring and using information—resulting in his functionally equaling the listings, which in turn would entitle him to benefits.

The Seventh Circuit has warned that "judges, including administrative law judges of the Social Security Administration, must be careful not to succumb to the temptation to play doctor." *Schmidt v. Sullivan*, 914 F.2d 117, 118 (7th Cir. 1990); *see also Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir. 1996). But the ALJ did not play doctor here. To begin with, K.C. was twice evaluated by state agency medical consultants, and both times the consultants concluded that he did not have a marked limitation in the attending and completing tasks domain. Doc. 11-3 at 23. Moreover, although Dr. Heinemann opined that K.C. did have a marked limitation in that domain, the ALJ did not substitute her own opinion for his, but simply explained why she gave his opinion less weight. Evaluating all three medical judgments along with other evidence in the record, the ALJ concluded that while K.C. did have significant limitations in attending and completing tasks, the limitations were not so severe as to be marked.

The ALJ was entitled to reach that conclusion. An ALJ may weigh and evaluate medical judgments by an expert so long as she does not make medical judgments of her own. *See Simila*

*v. Astrue*, 573 F.3d 503, 516 (7th Cir. 2009) (holding that an ALJ "is entitled to evaluate the evidence and explanations that support a medical source's findings") (citing 20 C.F.R. § 404.1527(d)(3)); 20 C.F.R. § 416.927(d)(3) (the supplemental security income regulation that is materially identical to § 404.1527(d)(3), the disability insurance benefits regulation addressed in *Simila*). And contrary to Staten's contention, Doc. 13 at 10, the ALJ was not obligated to ask Dr. Heinemann by post-hearing interrogatory how his assessment would change if he knew that K.C. was not fully compliant with his medication. In *Simila*, the Seventh Circuit held that the ALJ must solicit additional information from a medical source only if the support for the medical source's opinion "is not readily discernible." 573 F.3d at 516. By contrast, if the ALJ "discern[s] and discusse[s] the evidence upon which" the medical source relied and "simply f[inds] that this evidence fail[s] to support" the source's "conclusions," a request for additional information is not necessary. *Id.* at 516-17; *see also Spencer v. Astrue*, 776 F. Supp. 2d 640, 648 (N.D. Ill. 2011) (same). Because the ALJ did just that with Dr. Heinemann's opinion, she was not obligated to request additional information from him.

Staten argues further that the ALJ's conclusion was flawed because no doctor testified that K.C.'s failure to take Focalin on weekends would negatively affect his ability to attend to tasks during the school day. This mischaracterizes the ALJ's reasoning. The ALJ did observe that failure to consistently medicate K.C. "would be consistent with the reports of hyperactivity on the weekends by the claimant's mother." Doc. 11-3 at 23. But the ALJ did not conclude that K.C. was unmedicated *only* on weekends. Indeed, the very next sentence of the ALJ's opinion noted that "the claimant's most recent IEP and the statement of Ms. Barnes implied that the claimant had come to school non-medicated on more than one occasion." *Ibid*.

Finally, even setting aside the Focalin compliance issue, Staten argues that the ALJ still failed to address evidence showing that K.C. had marked limitations in the attending and completing tasks domain whether or not he was medicated. Doc. 13 at 11. That, too, is incorrect. The first piece of evidence cited by Staten is the 2012 IEP. In fact, the ALJ specifically discussed the 2012 IEP, noting that "[w]hile the claimant had a modified grading scale, a paraprofessional to assist him, and extended time on assignments, among other accommodations, he appeared to be meeting the standards set for him by the school." Doc. 11-3 at 21. The ALJ also reasoned that all of K.C.'s IEPs "showed that while on medication, the claimant showed a significant improvement in his ability to maintain attention and focus on completing tasks," even though he still required individualized support. *Ibid*.

The second piece of evidence that, according to Staten, the ALJ ignored—or, rather, misconstrued—is the questionnaire from Ms. Lopez, K.C.'s first-grade teacher. According to Staten, Ms. Lopez's answers supported a finding of marked limitation in the attending and completing tasks domain. Doc. 13 at 11. But the questionnaire was open to interpretation. Ms. Lopez rated K.C. as having "serious" or "very serious" problems with seven activities in the domain and less serious problems with six. Doc. 11-7 at 58. As the ALJ observed, these ratings suggested that while K.C. had difficulty working independently, he was better able to perform other relevant activities under the domain, like paying attention when spoken to directly and refocusing to task when necessary. Doc. 11-3 at 27. What is more, Ms. Lopez's questionnaire was just one data point that had to be considered alongside other evidence of K.C.'s functioning, like his IEPs and Ms. Barnes' observation that K.C. was "more focused/attentive" when on Focalin. Doc. 11-7 at 96. The ALJ closely examined all of this evidence and determined that although K.C. "still required significant accommodations while medicated," his symptoms were

sufficiently mitigated by medication to make his overall limitations less than marked for the attending and completing tasks domain. Doc. 11-3 at 26-27. The court cannot say that the ALJ's conclusion was unreasonable, especially because line between marked and less than marked limitations for any given domain is open to reasonable debate. *See Keys*, 347 F.3d at 994 (noting that, "when the dust settles, the agency retains substantial discretion" on this issue). As a result, the conclusion withstands judicial review. *See Shideler v. Astrue*, 688 F.3d 306, 310 (7th Cir. 2012) ("We do not reweigh the evidence or substitute our own judgment for that of the ALJ; if reasonable minds can differ over whether the applicant is disabled, we must uphold the decision under review."); *Flener ex rel. Flener v. Barnhart*, 361 F.3d 442, 448 (7th Cir. 2004) ("Because the ALJ analyzed the correct criteria and relied on appropriate medical evidence, a reasonable person could accept his decision as adequate.").

B. **The Standard for Disability**

Next, Staten argues that the ALJ in two respects "failed to apply the appropriate standard of disability in assessing [K.C.]'s ability to attend and complete tasks." First, Staten contends that the ALJ should have considered K.C.'s "ability to attend and complete tasks compared to other children his age without impairments, not [his] ability compared to himself." Doc. 13 at 12; *see* 20 C.F.R. § 416.924a(b)(3)(i) ("When we evaluate your functioning, we will look at whether you do the things that other children your age typically do or whether you have limitations and restrictions because of your medically determinable impairment(s)."). Second, Staten contends that the ALJ should have considered how K.C. functioned outside of his school's supportive environment. Doc. 13 at 13; *see* 20 C.F.R. § 416.924a(b)(5)(iv)(C) ("Even if you are able to function adequately in the structured or supportive setting, we must consider how you

function in other settings and whether you would continue to function at an adequate level without the structured or supportive setting.").

Staten is wrong, as the ALJ considered both of these things. Pursuant to the Social Security Administration's "whole child" approach, the ALJ "evaluated how the child functions in all settings and at all times, as compared to other children the same age who do not have impairments." Doc. 11-3 at 18; *see* SSR 09-1p, *Title XVI: Determining Childhood Disability Under the Functional Equivalence Rule—The "Whole Child" Approach*, 2009 WL 396031 (S.S.A. Feb. 17, 2009). The ALJ not only recited the correct standard, but also applied it correctly. She considered evidence comparing K.C.'s functioning to other children his age, and she assessed his performance against the level expected from a school-age child without an impairment. Doc. 11-3 at 21, 26. In addition, the ALJ asked K.C. and Staten about K.C.'s performance at home, and she considered medical records describing K.C.'s ability to complete his homework. *Id*. at 19-20, 22. Given all this, the ALJ applied the appropriate legal standard. *See Shatraw ex rel. K.C.Y. v. Astrue*, 2012 WL 589667, at *4 (N.D.N.Y. Feb. 22, 2012) (finding § 416.924a(b)(5)(iv)(C) satisfied when "the ALJ assessed the report of [the claimant's] general education teacher as well as testimony from [his mother] regarding his functioning at home").

### C. **Substantial Evidence**

Finally, Staten claims that the ALJ's decision was not supported by substantial evidence and that she failed to "build a logical bridge" between the evidence and her conclusion. This argument largely mirrors Staten's other contentions; for example, Staten reiterates her argument that the ALJ ignored contradictory evidence of K.C.'s limitations in the teacher questionnaires and the 2012 IEP. Doc. 13 at 14-15. The court addressed and rejected those arguments above.

This is not a case like *Giles ex rel. Giles v. Astrue*, 483 F.3d 483 (7th Cir. 2007), which Staten cites. Unlike the situation in *Giles*, here the ALJ did not just "summarily conclude[] that 'in all other domains and areas of functioning the claimant has some deficits, but is less than markedly limited.'" *Id*. at 487. Rather, after evaluating all of the evidence bearing on K.C.'s ability to attend and complete tasks—the questionnaires, the IEPs, testimony from K.C. and Staten, medical opinions, prescription records, and treatment notes—the ALJ provided "an explanation of why strong evidence favorable to the plaintiff [was] overcome" by other evidence showing K.C.'s limitations to be less severe with medication. *Id*. at 488. Her opinion suffices to "assure [the court] that [she] considered the important evidence" and enables the court to "trace the path of [her] reasoning" in concluding that K.C. was not disabled. *Hickman*, 187 F.3d at 689 (internal quotation marks omitted); *see Zurawski*, 245 F.3d at 888 (requiring the ALJ to "articulate at some minimal level her analysis of the evidence to permit an informed review") (internal quotation marks omitted).

## Conclusion

For the foregoing reasons, Staten's summary judgment motion is denied and the Commissioner's decision is affirmed.

February 24, 2015

United States District Judge